Rodeen Talebi (SBN 320392)
talebi@fr.com
**FISH & RICHARDSON P.C.**
500 Arguello Street, Suite 400
Redwood, CA  94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Attorneys for Defendant
TALKDESK, INC.

**Additional Counsel Listed on Signature Page**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA,

OAKLAND DIVISION

| | |
|---|---|
| ORION LABS TECH, LLC, | CASE NO.  4:25-cv-05045-YGR |
| Plaintiff, | **DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS PLAINTIFF ORION LABS TECH, LLC'S FIRST AMENDED COMPLAINT** |
| v. | |
| TALKDESK, INC., | Date:    September 9, 2025 |
| Defendant. | Time:    2:00 pm |
| | Dept.:   Courtroom 1, 4th Floor |
| | Judge:  Hon. Yvonne Gonzalez Rogers |

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................ 2

II.   THE ASSERTED PATENTS ARE BASED ON UNPATENTABLE
      SUBJECT MATTER AND SHOULD BE DISMISSED UNDER RULE
      12(b)(6) ................................................................................................................... 2

      A.    Background on the Asserted Patents.......................................................... 2

      B.    Legal Standard .......................................................................................... 3

      C.    The Asserted Patents are Invalid as Directed to Abstract Ideas ............................ 4

            1.    *Claim 1 of the '430 Patent is Ineligible* ........................................................ 5

                  a.    *Alice Step One: Claim 1 is directed to an abstract
                        idea of "virtual" assistants in group
                        communications* ...................................................................... 6

                  b.    *Alice Step Two: There is no inventive concept* .............................. 8

                  c.    *The Court can analyze just '430 Patent Claim 1 as
                        a representative claim* ................................................................. 9

            2.    *The claims of the '003 Patent are Ineligible* ............................................... 10

                  a.    *Asserted Claim 1 of the '003 Patent is not
                        meaningfully distinct from the representative claim* .................... 10

            3.    *The claims of the '339 Patent are Ineligible* ............................................... 11

            4.    *The claims of the '433 Patent are Ineligible* ............................................... 12

                  a.    *Alice Step One: Claim 1 is directed to an abstract
                        idea of "virtual" assistants* ......................................................... 13

                  b.    Alice *Step Two: There is no inventive concept* ........................... 14

                  c.    *Other claims of the '433 Patent do not alter the
                        analysis* .................................................................................... 15

            5.    *The claims of the '636 Patent are Ineligible* ............................................... 15

            6.    *The claims of the '733 Patent are Ineligible* ............................................... 16

i

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS
ORION LABS TECH, LLC'S 1ST AMENDED COMPLAINT
Case No. 4:25-cv-05045-YGR

7.    *The claims of the '130 Patent are Ineligible*..............................................16

    a.    *Alice Step One: Claim 1 is directed to an abstract idea of translation in group communications* ..............................18

    b.    *Alice Step Two: There is no inventive concept* ............................19

    c.    *Other claims of the '130 Patent do not alter the analysis* ........................................................................................19

8.    *The § 101 Inquiry is Ripe*..........................................................................20

D.    Orion Labs's "New Facts" and Declaration Do Not Change the *Alice* Analysis. .......................................................................................21

III.    CONCLUSION...........................................................................................................24

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS
ORION LABS TECH, LLC'S 1ST AMENDED COMPLAINT
Case No. 4:25-cv-05045-YGR

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alice Corp. Pty. v. CLS Bank Int'l,*
    573 U.S. 208 (2014)......................................................................................3, 7, 8, 20

*Bascom Research, LLC v. LinkedIn, Inc.,*
    77 F.Supp.3d 940 (N.D. Cal. 2015) ..........................................................................15

*Bilski v. Kappos,*
    561 U.S. 593 (2010)........................................................................................2, 9, 18

*Broadband iTV, Inc. v. Amazon.com, Inc.,*
    113 F.4th 1359 (Fed. Cir. 2024) ................................................................................5, 6

*BSG Tech LLC v. Buyseasons, Inc.,*
    899 F.3d 1281 (Fed. Cir. 2018)..................................................................................7, 19

*ChargePoint, Inc. v. SemaConnect, Inc.,*
    920 F.3d 759 (Fed. Cir. 2019)........................................................................................7

*Cleveland Clinic Found. v. True Health Diagnostics LLC,*
    859 F.3d 1352 (Fed. Cir. 2017)..................................................................................3, 8, 15

*CLS Bank Int'l v. Alice Corp. Pty. Ltd.,*
    717 F.3d 1269 (Fed. Cir. 2013) (*en banc* plurality opinion of Lourie, J.) .............................12

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.,*
    776 F.3d 1343 (Fed. Cir. 2014)..................................................................................6, 8, 19

*Credit Acceptance Corp. v. Westlake Servs.,*
    859 F. 3d 1044 (Fed. Cir. 2017)..................................................................................21

*Data Engine Techs. LLC v. Google LLC,*
    906 F.3d 999 (Fed. Cir. 2018)........................................................................................2

*Diamond v. Diehr,*
    450 U.S. 175 (1981)........................................................................................................8

*Dropbox, Inc. v. Synchronoss Techs., Inc.,*
    815 F. App'x 529 (Fed. Cir. 2020) ...............................................................................19

*Electric Power Grp., LLC v. ALSTOM SA,*
    830 F.3d 1350 (Fed. Cir. 2016)............................................................................... *passim*

*Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP*,
128 F. Supp. 3d 103 (D.D.C. 2015) ..................................................................................6

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ......................................................................................21

*Ficep Corp. v. Peddinghaus Corp.*,
No. 2022-1590, 2023 WL 5346043 (Fed. Cir. 2023) ........................................................6

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ........................................................................................5

*Intell. Ventures I LLC v. T-Mobile USA, Inc.*,
No. CV 13-1632-LPS, 2017 WL 3706495 (D. Del. Aug. 23, 2017), *aff'd*, 748
F. App'x 330 (Fed. Cir. 2019) ........................................................................................17

*Marble Voip Partners LLC v. Zoom Video Commc'ns, Inc.*,
670 F. Supp. 3d 1213 (D. Kan. 2023) ............................................................................20

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012) ............................................................................................................7

*Messaging Gateway Sols., LLC v. Amdocs, Inc.*,
No. 14-732-RGA, 2015 WL 1744343 (D. Del. Apr. 5, 2015) .........................................13

*Mobile Acuity Ltd. v. Blippar Ltd.*,
110 F.4th 1280 (Fed. Cir. 2024) .......................................................................................3

*Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*,
No. 14-612-RGA, 2015 WL 5156526 (D. Del. Sept. 2, 2015) ........................................12

*Orbcomm Inc. v. Calamp Corp.*,
215 F. Supp. 3d 499 (E.D. Va. 2016) ........................................................................12, 17

*Procter & Gamble Co. v. QuantifiCare Inc.*,
288 F. Supp. 3d 1002 (N.D. Cal. 2017) ..........................................................................20

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ........................................................................................5

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) ........................................................................................13

*Simio, LLC v. FlexSim Software Products*,
983 F.3d 1353 (Fed. Cir. 2020) ......................................................................................19

*Tenstreet, LLC v. DriverReach, LLC*,
   417 F. Supp. 3d 1144 (S.D. Ind. 2019), *aff'd*, 826 F. App'x 925 (Fed. Cir.
   2020) ...................................................................................................................10, 11

*In re TLI Commc'ns LLC Patent Litig.*,
   823 F.3d 607 (Fed. Cir. 2016).......................................................................17, 18

*Trinity Info Media, LLC v. Covalent, Inc.*,
   72 F.4th 1355 (Fed. Cir. 2023) ............................................................................13

*Two-Way Media v. Comcast Cable Communications*,
   874 F. 3d 1329 (Fed. Cir. 2017)..............................................................17, 18, 22

*Ultramerical, Inc. v. Hulu, LLC*,
   772 F.3d 709 (Fed. Cir. 2014)................................................................................2

*UTTO Inc. v. Metrotech Corp.*,
   119 F.4th 984 (Fed. Cir. 2024) ............................................................................19

*Yu v. Apple Inc.*,
   1 F.4th 1040 (Fed. Cir. 2021) ...........................................................................7, 20

**Statutes**

35 U.S.C. § 101........................................................................................... *passim*

## NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

NOTICE IS HEREBY GIVEN that on September 9, 2025, at 2:00 p.m., or as soon thereafter as counsel may be heard by the above-titled Court, located at 1301 Clay Street, Oakland, CA 94612, Defendant Talkdesk, Inc. ("Talkdesk") will and hereby do move the Court to dismiss Plaintiff Orion Labs Tech, LLC's ("Orion") First Amended Complaint (Dkt. No. 54) pursuant to Fed. R. Civ. P. 12(b)(6).

Talkdesk respectfully requests that Orion's First Amended Complaint be dismissed with prejudice under Fed. R. Civ. P. 12(b)(6) because the claims of U.S. Patent No. 10,110,430, U.S. Patent No. 10,462,003, U.S. Patent No. 10,897,433, U.S. Patent No. 10,924,339, U.S. Patent No. 11,127,636, U.S. Patent No. 11,258,733, and U.S. Patent No. 11,328,130 are invalid under 35 U.S.C. § 101 as they are directed to subject matter that is not patentable.

Talkdesk's motion is based on this Notice of Motion, the Memorandum of Points and Authorities in support thereof, and exhibits attached thereto, the pleadings and papers on file, and any evidence and argument presented to the Court at the hearing.

### STATEMENT OF THE ISSUES TO BE DECIDED

Whether Orion's First Amended Complaint fails to state a claim upon which relief can be granted because the claims of each of the Asserted Patents are invalid under 35 U.S.C. § 101 as directed to ineligible subject matter.

## I.    INTRODUCTION

This case should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. The Asserted Patents are ineligible under 35 U.S.C. § 101. They claim nothing more than an abstract idea applied to generic computing components for their well-known and conventional purposes. They are directed to an "intelligent agent" or "bot" that can perform services within group communications—like transcription or translation—that have been traditionally performed by humans. There is no innovation here. Using computers to automate or perform these tasks more quickly than humans are not patent eligible concepts.

## II.    THE ASSERTED PATENTS ARE BASED ON UNPATENTABLE SUBJECT MATTER AND SHOULD BE DISMISSED UNDER RULE 12(b)(6)

The Complaint should be dismissed for failure to state a claim. Fed. R. Civ. P. 12(b)(6). The Asserted Patents are ineligible for patenting under 35 U.S.C. § 101.

### A.    Background on the Asserted Patents

Orion Labs asserts U.S. Pat Nos. 10,110,430; 10,462,003; 10,897,433; 10,924,339; 11,127,636; 11,258,733; 11,328,130. *See* Dkt. No. 54, ¶ 1 ("Asserted Patents"). All Asserted Patents are directed to the same general field of intelligent software "agents" or "bots" in "communication groups." *See, e.g.*, '430 Pat., 1:15-17.

"Communication groups" are a defined collection of user devices engaged in interactive communications, information sharing, and data exchange within their group. *Id.*, 2:27-39. An example communication group may include a "team of firefighters" responding to a fire. *Id.*, 4:39-53. Each firefighter may have a "wearable push-to-talk communication device" that serves as a "node" in the group. *Id.*, 2:46-48. A second distinct communications group in this scenario may be made up of the medical response personnel. And a third group may be up made of law enforcement personnel. *Id.*, 4:39-53. By defining distinct communication groups like this, the devices "can securely share communications, data and other information without unauthorized interception or monitoring" by non-group-member nodes. *Id.*, 4:53-67.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS
ORION LABS TECH, LLC'S 1ST AMENDED COMPLAINT
Case No. 4:25-cv-05045-YGR

The focus of the patents is on providing an "intelligent agent" servicing a communications group as a "robot assistant" or "virtual assistant." *See, e.g.*, *id.*, 1:15-17; 7:30-41. This "intelligent agent" joins the communication group as another "node" alongside the human users. *Id.*, Fig. 1; Fig. 2.

For example, in the first responder scenario, a virtual assistant node can use a natural language interface to provide information about the fire as well as information regarding the actions and locations of other firefighters and other responders. A virtual assistant node may also record conversations among the users in the group, provide voice-based assistance and services, or provide other features. *Id.*, 4:27-53. It might use voice commands to retrieve information such as weather reports. *Id.*, 5:54-67. Or it may provide "[i]ntelligent annotation" features such as audio transcription of communications in different languages or dialects. *Id.*, 6:1-9.

In the later-filed patent applications, the inventors acknowledged that intelligent agents were already widespread and "commonplace," including in group communications. The inventors recognized the commercial availability of Amazon's Alexa, Microsoft's Cortana, Google's Assistant, and Apple's Siri virtual assistants. *See, e.g.*, '433 Pat., 1:14-50. They also noted the use of "bots" communicating with users of internet messaging services like Internet Relay Chat (IRC), Facebook, Twitter, AOL, and MSN Messenger. *Id.* These "bots" allowed people to ask questions in plain English and handle many tasks including reporting the weather or censoring profanity. *Id.*

### B.    Legal Standard

Patent eligibility under 35 U.S.C. § 101 is a threshold legal issue. *Bilski v. Kappos*, 561 U.S. 593, 602 (2010). It is properly determined on the pleadings "when there are no factual allegations that, when taken as true, prevent resolving the eligibility question as a matter of law." *Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018); *Ultramerical, Inc. v. Hulu, LLC*, 772 F.3d 709, 719 (Fed. Cir. 2014) ("[T]he district court properly invoked section 101 to dismiss [the plaintiff's] infringement suit on the pleadings.").

Under *Alice*'s two-step test for identifying patents that claim ineligible subject matter, courts first analyze whether "the claims at issue are directed to one of [the] patent-ineligible concepts," like an abstract idea. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014). If so, courts then determine whether the claim recites other elements that transform the claim into a patent-eligible application, examining whether there is an inventive concept that amounts to more than merely applying the abstract idea to a particular technological environment. *Id.*

After performing this analysis for one representative claim, courts can often extrapolate that conclusion to the remaining claims—limiting the analysis of a § 101 challenge to representative claims is proper when the claims at issue are "substantially similar and linked to the same" ineligible concept. *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) (internal quotation marks omitted). The challenger who identifies a claim as representative of a group of claims must initially show that the claims are "substantially similar and linked to the same" ineligible concept. *Id.* at 1360. "Once this occurs, the burden shifts to the patent owner to present non-frivolous arguments as to why the eligibility of the identified representative claim cannot fairly be treated as decisive of the eligibility of all claims in the group." *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1290 (Fed. Cir. 2024).

### C.    The Asserted Patents are Invalid as Directed to Abstract Ideas

All the Asserted Patents' claims are invalid under § 101. Because the patents are all directed to related methods, share similar specifications, and have insubstantial claim differences that do not alter their primary focus or claimed advance, this analysis can be performed with representative claims. Given the Asserted Patents' similarities, *Alice*'s two-step test is applied to asserted Claim 1 of the '430 Patent in full. Then, the analysis is applied to the representative claims of the remaining patents, identifying how they differ from '430 Patent Claim 1 or from each other, and explaining why these differences do not change the outcome of the *Alice* test.

Here, these representative claims, like all the claims, are directed to the abstract idea of virtual assistants in group communications. Their focus is only on, at their core, using a

4

computer to automate tasks that were previously performed by humans in group communications. Their use of conventional components and token, post-solution steps or functionality do not make the application of the abstract idea inventive. Thus, all claims are invalid.

### 1.    *Claim 1 of the '430 Patent is Ineligible*

Claim 1 of the '430 Patent is directed to the abstract idea of a "virtual" assistant in a communication group. Assistants joining group communications are a long-standing practice. A familiar example is the decades-old practice of court reporters attending a teleconference or hearing. The reporter joins the group call and provides assistance in the form of transcribing the conversation. There are other well-known examples of this common practice just in the legal field: technicians managing a videoconference, translators providing language services, judges mediating disputes in a deposition, and paralegals retrieving documents to aid a discussion.

Below is asserted Claim 1 described in the context of a teleconference for a deposition:

| Component and Function | Claim Element |
| --- | --- |
| A court reporting service hosts a teleconference | 1. A method of managing a communication group, wherein the communication group comprises a plurality of personal communication member nodes, the method comprising: |
| The service technician receives a request to add a court reporter | receiving instructions from at least one of the plurality of personal communication member nodes to instantiate an intelligent agent; |
| The technician calls the court reporter to add him or her to the teleconference bridge as another participant | instantiating the intelligent agent as a virtual assistant communication member node in the communication group; and |
| The court reporter transcribes the conversations | the instantiated intelligent agent recording and auditing communications among and between the plurality of personal communication member nodes in the communication group. |

As seen above, the claims do nothing more than describe a generic computer programmed to automate this well-known process with conventional components.

5

> a.    *Alice Step One: Claim 1 is directed to an abstract idea of "virtual" assistants in group communications*

Claim 1 is directed to the abstract idea of "virtual" assistants in group communications. When determining whether a claim is directed to an abstract idea, courts consider the "focus" or "claimed advance" of the claim. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018). Here, Claim 1's advance focuses on the *result*—an instantiating of an "intelligent agent as a virtual assistant." Because any conventional components recited by the claim do not diminish its focus from claiming a "virtual" assistant, Claim 1 (and all the claims it represents) is directed to the abstract idea.

To aid in determining Claim 1's "claimed advance," the Court can look past the conventional components that it employs. The Federal Circuit has "recognized that it may be necessary to analyze conventionality at step one . . . to determine what the patent asserts is the claimed advance over the prior art." *Broadband iTV, Inc. v. Amazon.com, Inc.*, 113 F.4th 1359, 1369 (Fed. Cir. 2024). Here, the claim recites only recites conventional and generic components without any attendant improvement.

In fact, the claim language on its face is so generic it does not appear to be directed at computers at all. When considered within the context computers as described in the specification, the claimed elements are still generic. The "personal communication member nodes" are generic sensors or "computing system[s]". '430 Pat., 2:7-12, 2:40-48. The links between the devices that underly their "communication group" can be a "combination[], variation[], or improvement[]" of any kind of known network link. *Id.*, 2:59-3:30. The network link could use "any of a variety of protocols . . . or any suitable protocol, variation, or combination thereof." *Id.*, 7:49-8:3.

Importantly, even though it is the core claimed advance, the "intelligent agent" is described only as generic "software" providing black box "modules" for functions like voice recognition, assistance, auditing, or security. *Id.*, Fig. 2, 7:10-41. These modules are software

6

implementations of functions typically performed by humans.[1] The voice recognition module, for example, "can adapt to individual language usage and preferences." *Id.*, 8:27-46. An end user "can dictate instructions in natural language" such as "questions or commands which are handled by intelligent agent." *Id.*

When these conventional features are removed, only one thing remains as the alleged "advance over the prior art." *Broadband iTV*, 113 F.4th at 1369. Here, that alleged advance is instantiating an "intelligent agent as a virtual assistant" "in the communication group." Put simply, the alleged advance is using a computer to perform a well-known process to achieve a desired result using well-known functions. This "method" is just an attempt to claim the desired result: a "virtual assistant" capable of recording and auditing a group conversation.[2] See *Electric Power Grp., LLC v. ALSTOM SA*, 830 F.3d 1350, 1356 (Fed. Cir. 2016) (cautioning against claims "so result focused, so functional, as to effectively cover any solution to an identified problem").

Claim 1 merely automates with a computer the well-known human activity of a human assistant collecting and recording information from a group conversation. But "[a]utomating a previously manual process is not sufficient for patent eligibility." *Ficep Corp. v. Peddinghaus Corp.*, No. 2022-1590, 2023 WL 5346043, at *4 (Fed. Cir. 2023). "This abstract concept of collecting, recognizing, and storing data is not patent-eligible." *Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP,* 128 F. Supp. 3d 103, 112 (D.D.C. 2015); *see also, Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014)

---

[1] Orion Labs admits this as much throughout its Amended Complaint and expert declaration. *See, e.g.*, Dkt. No. 85 (Zatcovich Decl.)

[2] Orion Labs admits as much throughout its Amended Complaint, arguing that its only "advance" over the prior art is the removal of human labor. *See, e.g.*, Dkt. No. 54, ¶52 ("[The] claims [of the '430 patent] are directed to, among other things, the provision of electronic group communications managed by a virtual assistant with recording and auditing services ***that solved problems in inter and intra-group electronic communications that were the result of the human condition (delay, distractibility, fatigue, lack of focus, and availability, etc.)***.") (emphasis added).

7

(invalidating patent claims "drawn to the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory" because "[t]he concept of data collection, recognition, and storage is indisputably well-known. Indeed, humans have always performed these functions.").

### b.     Alice Step Two: There is no inventive concept

A claim fails *Alice* step two if its "only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290–91 (Fed. Cir. 2018); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72–73 (2012) (explaining the inventive concept must be "significantly more" than the abstract idea itself). In other words, an abstract idea "cannot supply the inventive concept." *BSG Tech*, 899 F.3d at 1290. Because the representative claim merely applies the abstract idea, there is no inventive concept.

That Claim 1 is merely applying the abstract idea with conventional techniques is clear from its use of generic language that is often used to describe human activity rather than exclusively describe elements in a technological domain. Terms like "communication groups," "personal communication," "nodes," "intelligent agent," "assistant," and "recording and auditing" are typically used to describe human networks, roles, or tasks rather than just computing systems. As explained above, these are implemented using practically any variety of computing network, device, or technique. Because this "amount[s] to 'nothing significantly more' than an instruction to apply [the] abstract idea . . . using some unspecified, generic computer," these terms cannot make the abstract idea patent eligible. *Alice*, 573 U.S. at 225–26.

Claim 1 is "simply an abstract-idea-based solution implemented with generic technical components in a conventional way." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 775 (Fed. Cir. 2019). "Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf conventional computer technology." *Elec. Power Grp.,* 830 F.3d at 1355; *Yu v. Apple Inc.*, 1 F.4th 1040, 1045 (Fed. Cir. 2021). Nor does the arrangement of

8

these conventional components amount to "significantly more" than the abstract idea itself. *Intellectual Ventures I*, 838 F.3d at 1320.

c.    *The Court can analyze just '430 Patent Claim 1 as a representative claim*

When claims are "substantially similar and linked to the same abstract idea," courts look to representative claims to perform the § 101 analysis. *Content Extraction*, 776 F.3d at 1349; *Alice*, 573 U.S. at 224–26 (invalidating over two-hundred claims across four patents based on two representative claims). Because the remaining claims are directed to the same features in some narrowed way or add features that do not alter the claim's focus on the abstract idea of "virtual" assistants in group communications, Claim 1 is representative of all the '430 Patent's claims.

The '430 Patent contains 17 claims, three of which are independent claims. The two other independent claims 7 and 13 recite essentially the same basic components as Claim 1. In addition:

- Claims 2, 8, and 15 make the system responsive to voice instructions;

- Claims 3, 9, and 17 add generic security and encryption;

- Claims 4 and 10 call for execution in a generic "cloud" system;

- Claims 5, 11, and 14 recite a generic "management system"; and

- Claims 6, 12, and 19 limit the use to conventional "wearable push-to-talk devices."

None of these extra limitations, nor any other in the independent claims, transform the underlying abstract idea—they are all just adding token, post-solution steps, functionality, or technological environments that do not alter the claims' focus on abstract "virtual" assistants. *Cf. Cleveland Clinic*, 859 F.3d at 1360 (finding claims representative even though dependent claims "require[d] specific analytical techniques" or "limit[ed] the predetermined comparison values to" a specific embodiment). "[I]nsignificant post-solution activity will not transform an unpatentable principle into a patentable process." *Diamond v. Diehr*, 450 U.S. 175, 191–92 (1981). "[W]hile these claims may have a narrower scope than the representative claims, no claim contains an

9

'inventive concept' that transforms the corresponding claim into a patent-eligible application of the otherwise ineligible abstract idea." *Content Extraction*, 776 F.3d at 1349. Specifying that the system is, for example, secure, cloud-based, or used with wearable radios, does not make it inventive. The Supreme Court "established that limiting an abstract idea to one field of use" does "not make the concept patentable." *Bilski*, 561 U.S. at 612.

### 2. The claims of the '003 Patent are Ineligible

The claims of the '003 Patent do not meaningfully differ from representative Claim 1 of the '430 Patent and the ineligibility analysis is not different.

> a. *Asserted Claim 1 of the '003 Patent is not meaningfully distinct from the representative claim*

Asserted Claim 1 of the '003 Patent, for example, only adds the limitation of "where to instantiate the intelligent agent." This limitation received only cursory treatment in the patent's specification:

> In some implementations, a user or node **102-104** can specify where and/or how node **106** is to be executed (e.g., by selecting a specific host node or host computing system, or by specifying a physical location, where specified locations can include a home or business server, a country of execution for distributed computing systems, and others).

'003 Pat., 2:64-67, 5:51-57.

The location of instantiation is only a post-solution restriction that is not directed to a technological innovation. As the specification indicates, this location may simply be defined as a physical location. This is no different from well-known human activity. In the context of a telephonic hearing, for example, the participant can specify to the assistant to come join the call from the same office rather than dialing in from a phone in a separate office.

Other claims of the '003 Patent do not alter the analysis. The '003 Patent contains 23 claims, three of which are independent claims. The two other independent claims 8 and 15 recite essentially the same basic components as Claim 1. In a way, the independent claims are even

10

more generic than the '430 Patent because the "intelligent agent" here provides an unspecified "service" rather than "recording and auditing." Dependent claims 4, 11, and 18 recite a laundry list of specific services that the agent can perform, which are the kind of services human assistants have always provided.

Dependent claims 2, 9, and 17 (voice instructions), claims 3, 10, and 20 (security/encryption), claims 5 and 12 (cloud instantiation), claims 6, 13, and 16 (management system), and claims 7, 14, and 19 (wearable push-to-talk devices), are similar to the dependent claims in the '430 Patent.

Claims 21, 22, and 23 recite instantiating the intelligent agent on various locations such as a host node, a physical location, or as a virtual machine on a user node, management system, or agent system. These alternatives are post-solution limitations that do not alter the abstract idea or provide a technological innovation. The patent explains that it does not meaningfully distinguish between instantiating in various locations, because they may be "separate entities," or "combined into a single entity," or included in any node, "*or can be implemented in any other suitable fashion.*" *See id.*, 3:67-4:6 (emphasis added).

### 3. *The claims of the '339 Patent are Ineligible*

The claims of the '339 Patent do not meaningfully differ from representative Claim 1 of the '430 Patent and the ineligibility analysis is not different.

The independent claims of the '339 Patent (claims 1, 8, and 15) vary only in that the claimed service is "transcribing" rather than "recording and auditing." In addition, dependent claims 2, 9, and 17 (voice instructions), claims 3, 10, and 20 (security/encryption), claims 5 and 12 (cloud instantiation), claims 6, 13, and 16 (management system), and claims 7 and 14 (wearable push-to-talk devices), are similar to the dependent claims in the '430 Patent.

Claims 4, 11, and 19 only specify the direction in which transcription is performed—audio-to-text or text-to-audio. And Claim 18 addresses *storing* the transcribed communications. Transforming and storing information is not a function that would alter the patent eligibility

11

analysis. *Tenstreet, LLC v. DriverReach, LLC*, 417 F. Supp. 3d 1144, 1148 (S.D. Ind. 2019), *aff'd*, 826 F. App'x 925 (Fed. Cir. 2020) ("[T]he Court finds that the claims are directed to the abstract idea of collecting, organizing, and storing data on a generic computer and fail to add an inventive concept sufficient to transform the abstract idea into patent-eligible subject matter.").

### 4.    *The claims of the '433 Patent are Ineligible*

The '433 Patent is similarly directed to the abstract idea of a "virtual" assistant in group communications. Here, however, the patent calls it a "bot" rather than a "virtual assistant." But there is no meaningful difference. A "bot" is simply "software application that runs automated tasks (scripts) over the internet." '433 Pat., 1:16-23. The '433 Patent acknowledges that bots are widespread and "commonplace," including in group communications in internet messaging services. *See, e.g.*, *id.*, 1:14-50. These "bots" allowed people to ask questions in plain English to automate many tasks. *Id.*

The primary difference between the '433 and the '430 Patent is the use of generic software to convert audio into "enhanced text" before delivering it to the virtual assistant to perform a task. "Enhanced text" is just "clarified and simplified" text in "a form more suitable for presentation to a bot . . . to execute." *Id.*, 12:21-27. But this is still a function that humans have always performed: providing translation services.

Asserted Claim 1 is recited below:

| Component and Function | Claim Element |
|---|---|
| | 1. A method comprising: |
| Asking a question in Spanish during a teleconference with an English-speaking court reporter | receiving, by a group messaging service configured to manage audio messaging between a plurality of user nodes in a group comprising at least a user node, a second user node, and a bot software application member node, a message from the user node comprising recorded audio and including a request, a user node identifier that identifies the user node, and a group identifier that identifies the group; |

12

| Component and Function | Claim Element |
|---|---|
| Locating a Spanish-English translator | selecting a selected voice library from a plurality of voice libraries to process the recorded audio, a voice library including both a speech-to-text engine and a natural language unit configured to convert a received message into enhanced text in a format suited to processing by the bot; |
| Translating the question to English for the court reporter on the line | processing, by the selected voice library, the recorded audio to produce the enhanced text comprising the request; sending, by the group messaging service, the enhanced text to the bot; |
| Who confirms to everyone they have transcribed the translation | receiving, at the group messaging service, a reply from the bot, the reply comprising information indicating completion of the request; and sending, to the user node and the second user node, a group reply indicating completion of the request. |

> a.    *Alice Step One: Claim 1 is directed to an abstract idea of "virtual" assistants*

Claim 1 of the '433 Patent is also directed to an abstract idea of "virtual" assistants in group communications.

The use of "bots" is no less abstract than the prior patents' use of "virtual assistants." The purpose of "bots" is simply to perform tasks "at a much higher rate than would be possible for sending, by the group messaging service, the enhanced text a human alone." *Id.*, 1:20–23. That is, they are a generic computing component being used as a tool to work faster than human. This does not render a claim nonabstract. *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (*en banc* plurality opinion of Lourie, J.) ("[S]imply appending generic computer functionality to lend speed or efficiency to the performance of an otherwise abstract concept does not meaningfully limit claim scope for purposes of patent eligibility.").

The selection of a voice library to convert a message into "enhanced text" also does not make the claims nonabstract. District courts have consistently held that the mere concept of translating information to bridge computing components also constitutes an abstract idea. *See,*

13

*e.g.*, *Orbcomm Inc. v. Calamp Corp.*, 215 F. Supp. 3d 499, 506 (E.D. Va. 2016); *Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*, No. 14-612-RGA, 2015 WL 5156526 at *3 (D. Del. Sept. 2, 2015) (holding patent that translated between different computer formats for electronic delivery of messages was directed to the abstract idea of translation); *Messaging Gateway Sols., LLC v. Amdocs, Inc.*, No. 14-732-RGA, 2015 WL 1744343 at *4 (D. Del. Apr. 5, 2015) (holding patent that translated messages between SMS text message format and Internet Protocol format was directed to the abstract idea of translation).

            b.        Alice *Step Two: There is no inventive concept*

The use of a voice library is not an inventive concept. The patent does not explain how voice libraries work because they are merely conventional components found in computing. The specification only describes, for example, that a voice library has "speech-to-text engine 902B and a natural language unit 903B." '433 Pat., 14:63:66. The conventional engine and unit are depicted as black boxes. *Id.* at Fig. 10. The same goes for the "enhanced text." There is nothing interesting about its enhancement, other than "it may be required by the bot." *Id.*, 14:66-15:3.

"[N]othing in the patent contains any suggestion that the [libraries] needed for that purpose are anything but readily available." *Id.* Thus, the voice library is described as nothing more than "off-the-shelf, conventional computer, network, and display technology for gathering, sending, and presenting the desired information." *Id.* at 13:55. "[S]uch invocations of computers and networks that are not even arguably inventive are 'insufficient to pass the test of an inventive concept in the application' of an abstract idea." *Id.*

The use of user node or group "identifiers" is also not an inventive concept. Just like humans learn and use people's names when interacting with others, "identifiers" are just a generic computing component. *See Trinity Info Media, LLC v. Covalent, Inc.*, 72 F.4th 1355, 1364 (Fed. Cir. 2023) ("The use of a unique identifier does not prevent a claim from being directed to an abstract idea."); *see also Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 910 (Fed. Cir. 2017) ("The fact that an identifier can be used to make a process more

14

efficient, however, does not necessarily render an abstract idea less abstract."). The patent does not describe "identifiers" being used any differently than how people use each other's names.

#### c.    Other claims of the '433 Patent do not alter the analysis

The '430 Patent contains 20 claims, three of which are independent claims. The two other independent claims 10 and 17 recite the essentially the same basic components as Claim 1.

Dependent claims 2, 4, 8, 9, 11, 15, 16, and 20 simply recite further use of "identifiers," but do not describe an unconventional or innovative use of them. Just like names, they are merely used to identify the source or destination of information, or to confirm membership in a group. Claims 3, 12, 18 merely describe decoding, converting, and enhancing. Such manipulation of information is not innovative. *Electric Power Grp.,* 830 F.3d at 1355 (Fed. Cir. 2016). Claims 5 and 19 send the message to all group members, which is something already natural in a group communication. Claims 6 and 13 simply describe selecting a "preferred" voice library, with no technological basis behind it. Claims 7 and 14 require "encoded" audio, but this is a tautology—all audio in computing is "encoded" in some fashion.

### 5.    The claims of the '636 Patent are Ineligible

The '636 Patent is also directed to the abstract idea of a "virtual" assistant in group communications. Like the '433 Patent, the '636 Patent calls it a "bot." '636 Pat., 1:14-49.

With respect to independent claims 1, 10, and 16, there is no meaningful difference in the analysis from the '433 Patent. Both claim substantially the same subject matter. Specifically, the '636 Patent similarly claims using identifiers to select a "bot," confirm membership in a group, select appropriate voice libraries, and produce useful information for processing by the bot.

Dependent claims 2, 5, 9, 13, and 18 simply address that some bots are user-specific (*e.g.,* responding only to the requester) but others work for the benefit of the group. Claims 3 and 12 recite the speech-to-text and text enhancement function. Claim 4 indicates the user's audio message has an address, but does nothing with it. Claim 11 uses the system for "order fulfillment." Claims 14 and 15 provide an audio, rather than text, reply. Claim 6, 7, 17, and 20

15

recognize that some bots first need translation (whether to enhanced text or a different audio encoding) to provide services. Claims 8 and 19 simply confirm a bot is a member in a group.

None of these dependent claims implementing these or other variations transform the underlying abstract idea of a "virtual" assistant in group communications or represent an innovative advance. *Cf. Cleveland Clinic*, 859 F.3d at 1360 (finding claims representative even though dependent claims "require[d] specific analytical techniques" or "limit[ed] the predetermined comparison values to a single value or representative value or ranges").

### 6.    *The claims of the '733 Patent are Ineligible*

The claims of the '733 Patent do not meaningfully differ from representative Claim 1 of the '433 Patent and the ineligibility analysis is not different. The independent claims of the '733 Patent (claims 1, 8, and 15) are substantially similar to those of the '433 Patent, except the '733 Patent is limited to handling an "audio transcription request" rather than "a generic request of the "virtual" assistant bot.

In addition, dependent claims 2, 9, and 16 (IP address) and claims 3, 4, 10, 11, and 17 (database lookups) merely use identifiers to route messages or look up data. The use of this information to identify and act on associations is still abstract. *Bascom Research, LLC v. LinkedIn, Inc.*, 77 F.Supp.3d 940, 949 (N.D. Cal. 2015) (invalidating claims describing "the abstract idea of creating, storing, and using relationships between objects" because "the concept of establishing and using relationships between documents is a common, age-old practice"). Claims 5, 12, and 18 simply recite using the "virtual" assistant bot for transcription multiple times. And claims 6, 7, 13, 14, 19, and 20 recite broadcasting the messages and replies to all group members, which is unremarkable for a group communication.

### 7.    *The claims of the '130 Patent are Ineligible*

The '130 Patent is slightly different than the others, although it too is directed to generic software that facilitates group communications. Specifically, the '130 Patent is directed to the function of translation.

16

The patent recognized that, despite new technology enabling global conversations:

> [i]t *remains* difficult to have conversations over distributed voice communication systems in scenarios where users are attempting to converse in more than one language. In such scenarios it is often necessary to have translators present, which can break down the flow and speed in which real-time group conversations take place.

'130 Pat., 1:15-26 (emphasis added). That is, the need for translation was a problem even *before* the introduction of technology.

The claimed solution merely uses computers as a tool to facilitate translation. Exemplary Claim 1 is below:

| Component and Function | Claim Element |
| --- | --- |
|  | 1. A method comprising: |
| A translator assists with groups trying to talk to each other | performing, at a remote management server configured for managing group communications between multiple communication devices, a process for providing real-time translation for group communications, including: |
| A participant has a preferred language and belongs to several groups | registering a first communication device with the remote management server, including associating the first communication device with: a first language preference, a primary group communication setting identifying a first set of communication devices, and a secondary group communication setting identifying a second set of communication devices; |
| The participant speaks | receiving, from the first communication device, a speech input and a first device identifier for the first communication device; |
| The translator figures out who he is speaking to | accessing an account log associated with the first communication device based on the first device identifier; determining a plurality of communication devices to distribute the speech input to based on the primary group communications setting from the account log; |
| For each listener, translate the message if they speak a different language | determining a preferred language associated with each of the plurality of group communication devices; grouping each of the |

17

| Component and Function | Claim Element |
|---|---|
| | plurality of communication devices into one or more groups based on corresponding preferred languages, each group associated with a separate language; for languages different from the first language preference, translating the speech input into a translated speech input corresponding to the preferred languages for each of the one or more groups prior to sending the speech input; and sending the translated speech input to each communication device of the one or more groups. |

> a.    *Alice Step One: Claim 1 is directed to an abstract idea of translation in group communications*

Claim 1 of the '130 Patent is directed to translation. The use of computing components is conventional and routine, and Claim 1 does nothing more than use computers as a tool to collect, manipulate, and make information comprehensible. But this does not "invoke any assertedly inventive programming." *Electric Power Grp.*, 830 F.3d at 1355. "Merely requiring the selection and manipulation of information—to provide a 'humanly comprehensible' amount of information useful for users—by itself does not transform the otherwise-abstract" idea. *Id.* "District courts have consistently held that the mere concept of translating information also constitutes an abstract idea." *Orbcomm*, 215 F. Supp. 3d at 506 (E.D. Va. 2016) (citing cases); *see also Intell. Ventures I LLC v. T-Mobile USA, Inc.*, No. CV 13-1632-LPS, 2017 WL 3706495, at *10 (D. Del. Aug. 23, 2017), *aff'd*, 748 F. App'x 330 (Fed. Cir. 2019).

The patent recognizes the problem to be solved did not arise in the technological realm and preceded global electronic communications. *See* '130 Pat., 1:15-26 ("It *remains* difficult to have conversations . . . where users are attempting to converse in more than one language.") (emphasis added).

At best, the claim "proposes the use of generic computer components to carry out the recited abstract idea, but that is not sufficient." *Two-Way Media v. Comcast Cable*

18

*Communications*, 874 F. 3d 1329, 1338 (Fed. Cir. 2017); *In re TLI Commc'ns LLC Patent Litig.,* 823 F.3d 607, 611 (Fed. Cir. 2016) (holding that, despite reciting "concrete, tangible components," the claims were directed to an abstract idea where "the physical components merely provide[d] a generic environment in which to carry out the abstract idea").

> b.    *Alice Step Two: There is no inventive concept*

Merely reciting the use of a generic computer or adding the words "apply it with a computer" cannot convert a patent-ineligible abstract idea into a patent-eligible invention. *Two-Way Media*, 874 F.3d at 1338. But that is all that is done here. The claims merely recite "performing, at a remote management server." The invocation of computing components merely limits the idea to a specific technological environment rather than an innovative application of the idea. *See Bilski*, 561 U.S. at 610-611 ("[T]he prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment.") (quotations and citations removed).

The specification confirms that the technological environment is not material to the claim. The environment can be virtually any kind of network. *See* '130 Pat., 6:65-7:14. The use of identifiers is also conventional and not innovative. And the means for handing audio and translation are off-the-shelf—the patent is silent as to any specific mechanism for accomplishing these functions. It only explains that it may be performed by "one or more language translation engines, or translation bots." *Id*., 3:56-64; *see also id*., 6:23-34, 9:50-58, 10:9-19, 11:44-59.

Thus, "no inventive concept resides in the claims." *TLI Commc'ns*, 823 F.3d at 1340-41. "[N]othing in [the claim] requires anything other than conventional computer and network components operating according to their ordinary functions." *Id.*

> c.    *Other claims of the '130 Patent do not alter the analysis*

The '130 Patent contains 20 claims, three of which are independent claims. The two other independent claims 11 and 16 recite the essentially the same basic components as Claim 1.

19

Dependent claims 2, 12, 17 merely state that the user decides what their language is. Claims 3, 4, 13, 14, and 18, associate a participant's language with an IP address. And claims 5, 6, 15, and 20 revolve around natural language processing to detect the language. That the claims recite both human and computer means for identification of language emphasizes that the claims are directed to the realm of the abstract, rather than a specific improvement of technology.

Finally, dependent claims 7, 8, 9, and 10 recite using packetized audio technology, such as the "Opec" audio codec. Such technology is ancillary to the claimed idea of translating group communications over the Internet. The patent does not describe what the "Opec" codec is. It assumes the reader knows of it because it is merely "off-the-shelf" means for speech transmission over a conventional packetized network like the Internet. *Elec. Power Grp.*, 830 F.3d at 1355 ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf conventional computer technology.")

### 8.    *The § 101 Inquiry is Ripe*

This motion is ripe. The Court need not credit the token allegations of novelty and inventiveness in Orion Labs's Complaint. *Simio, LLC v. FlexSim Software Products*, 983 F.3d 1353, 1365 (Fed. Cir. 2020) ("We disregard conclusory statements when evaluating a complaint under Rule 12(b)(6)."); *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) ("[A]llegation[s] about inventiveness, wholly divorced from the claims or the specification, do[] not defeat a motion to dismiss; only plausible and specific factual allegations that aspects of the claims are inventive are sufficient.") (internal quotations omitted). Nor are there any factual disputes about novelty or unconventionality that preclude resolution for a simple reason: claims that simply apply the underlying abstract idea, like the representative claims do here, do not require investigations of conventionality. *BSG Tech*, 899 F.3d at 1291 ("Here, the only alleged unconventional feature of BSG Tech's claims is the requirement that users are guided by summary comparison usage information or relative historical usage information. But this simply restates what we have already determined is an abstract idea.").

20

Finally, claim construction is not a barrier to the patent eligibility analysis. No potential construction can alter the fact that the plain language of the representative claims is directed to any abstract idea. *UTTO Inc. v. Metrotech Corp.*, 119 F.4th 984, 994 (Fed. Cir. 2024) ("[S]ometimes a claim's meaning may be so clear on the only point that is ultimately material to deciding the dismissal motion that no additional process is needed."); *Content Extraction*, 776 F.3d at 1349.

### D.    Orion Labs's "New Facts" and Declaration Do Not Change the *Alice* Analysis.

When Orion Labs filed the initial complaint, Talkdesk responded with a motion to dismiss for patent ineligibility. Dkt. No. 9. Recognizing the weakness in its patents, Orion Labs attaches an expert declaration from Mr. Ivan Zatkovich to its Amended Complaint in an attempt to survive a 12(b)(6) motion. But the Zatkovich Declaration only offers conclusory statements or assertions plainly unsupported by the specification of the patent, as discussed it greater detail below. The Court should not consider the Declaration when ruling on this Rule 12(b)(6) motion to dismiss because it is not a "written instrument." Fed. R. Civ. P. 10(c). Instead, whether this motion should be granted should depend on whether the patents themselves withstand 12(b)(6) scrutiny, without resorting to expert testimony. *Yu v. Apple Inc.*, 1 F.4th at 1046 (citing *Genetic Techs. Ltd. V. Merial L.L.C.*, 818 F.3d 1369, 1373 (Fed. Cir. 2016)); *see also Marble Voip Partners LLC v. Zoom Video Commc'ns, Inc.*, 670 F. Supp. 3d 1213, 1221-22 (D. Kan. 2023) (defending against a § 101 invalidity challenge "does not necessarily mean that it is authorized to introduce expert declarations at the Rule 12(b)(6) stage."); *Procter & Gamble Co. v. QuantifiCare Inc.*, 288 F. Supp. 3d 1002, 1025 (N.D. Cal. 2017) ("That result is not changed even if the Court considers Plaintiffs' submitted declaration of Sachin Patwardhan, which merely spells out the algorithmic processes in more detail.").

The amended complaint also adds "new facts" by relying on the Declaration—citing to it over 180 times. These "new facts" either (1) contain legal conclusions suited for a legal brief but

21

not factual allegations can state a plausible claim of patent eligibility or (2) do not alter the analysis because, even if accepted as true, they only reinforce that the claims are directed to automating tasks previously performed by humans using generic computing components.

For example, with respect to the '430, '003, and '399 patents, Orion Labs alleges that their claimed inventions are not abstract because they "remov[e] the human element from such inter and intra-group communications." *See, e.g.*, Dkt. No. 54, ¶50. That is, Orion Labs admits that it is automating the human element of existing processes, which is an idea ineligible for patenting. *Credit Acceptance Corp. v. Westlake Servs.*, 859 F. 3d 1044, 1055 (Fed. Cir. 2017) ("Our prior cases have made clear that mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology.")

For the '733 patent, Orion Labs's new allegations are similar, arguing that '733 patent is patent-eligible subject matter because it solves the problem of "deliver[ing] transcribed messages automatically[.]" *Id.*, ¶276. Again, Orion Labs' "new facts" demonstrate that the claims are directed to automating processes previously performed by humans: publishing to external services such as "social media platforms," *Id.*, ¶280, by "launching a bot" to perform the task rather than a human. *Id.*, ¶281. The alleged benefit is that this automation avoids "inefficient workflow in transcription and publishing" such as "manual intervention" when humans are involved. *Id.*, ¶277. Here, the computers are "invoked merely as a tool" rather than an improvement to the *way* computers operate. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016).

Similarly, regarding the '130 patent, Orion Labs alleges that it "eliminat[es] dependence on human translators." *Id.*, ¶322. But the alleged benefits are just those found by replacing a human with a computer: "immediate," "immediately," without requiring "available humans" and "never fatigued or distracted." *Id.*, ¶323. The claimed solution is not a technological improvement—it is simply automating a human task in group communications: "identify[ing]

22

the preferred language for each communication device in the distribution group and translat[ing] the speech input accordingly." *Id.*, ¶324.

For the '636 patent, Orion Labs alleges it is "directed advancements in bot technologies by enabling group messaging services to interact with both user-oriented bots and group-oriented bots using bot-specific voice libraries." *Id.*, ¶247. But as demonstrated above, the patent admitted that "bots" were just generic computing software for automating tasks. '636 Patent at 1:18-23 ("Typically, bots perform tasks that are both simple and structurally repetitive, at a much higher rate than would be possible fora human alone."). The alleged "advancement" is not an *improvement* to "bot technologies." Rather, the claims are simply directed to using a "bot" to perform a task that allegedly had not been automated prior to March 2017. Dkt. No. 54, ¶154. But being the first to use a computer as tool to automate something performed by humans does is not a patent eligible idea. *Two-Way Media*, 874 F.3d at 1340 ("Eligibility and novelty are separate inquiries.").

According to Orion Labs, the supposed novelty in the '636 patent rests in the use of voice libraries. *See* Dkt. No. 54, ¶246. But as explained above, Section II.C.4.b, voice libraries were depicted in the patent not as an innovation in "bot technology," but as pre-existing "black boxes" that could already perform the function of transcribing speech or understanding natural language. *See, e.g.*, '636 Patent at 2:19-31. The fact that bots should now select from among voice libraries is thus no less abstract. As explained above, this is just computerizing the task of a teleconference host selecting an appropriate language translator to process the conversation. *Supra* Section II.C.4.b. At bottom, Orion Labs admits the whole point of the '636 patent is to automate by removing the human from the loop: "In fact, the concepts of bots in general are to bypass the limitations of the human condition." *Id.*, ¶248.

DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS
ORION LABS TECH, LLC'S 1ST AMENDED COMPLAINT
Case No. 4:25-cv-05045-YGR

## IV.     CONCLUSION

Talkdesk respectfully requests that the Court dismiss the Complaint for failure to state a claim because the patents are ineligible under Section 101.

Date: August 4, 2025

FISH & RICHARDSON P.C.

/s/ Rodeen Talebi
Rodeen Talebi (SBN 320392)
talebi@fr.com
500 Arguello Street, Suite 400
Redwood, CA  94063
Tel. 650.839.5070
Fax: 650.839.5071

Nathan Siegel (SBN 358405)
siegel@fr.com
12860 El Camino Real, Suite 400
San Diego, CA 92130
Tel. 858.658.5070
Fax: 858.678.5099

David B. Conrad *pro hac vice*
conrad@fr.com
Neil J. McNabnay  *pro hac vice forthcoming*
mcnabnay@fr.com
Andria Rae Crisler *pro hac vice*
crisler@fr.com
FISH & RICHARDSON, P.C.
1717 Main Street, Suite 5000
Dallas, Texas 75201
Tel. 214.747.5070
Fax: 214.747.2091

Taylor M. Reeves *pro hac vice forthcoming*
Delaware Bar No. 6900
FISH & RICHARDSON P.C.
222 Delaware Avenue, Suite 1700
Wilmington, DE 19801
Tel. 302.652.5070
Fax: 302.652.0607

ATTORNEYS FOR DEFENDANT
TALKDESK, INC

24